UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
KANGADIS, INC. d/b/a                          :
GOURMET FACTORY,                              :
                                              :
                    Plaintiff,                :                    **ORDER**
                                              :
            -against-                         :              05-CV-111 (DLI)(RML)
                                              :
EUPHRATES, INC.,                              :
                                              :
                    Defendant.                :
--------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

At issue in this application for a preliminary injunction is use of the word TRADITIONAL

by Euphrates, Inc. ("Euphrates" or "defendant") on the label of its feta cheese. Kangadis, Inc. d/b/a

Gourmet Factory ("Gourmet Factory" or "plaintiff") seeks to enjoin Euphrates from its use of this

mark pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125 ("Lanham Act"). Gourmet Factory

argues that trademark protection is warranted because of its first, exclusive, and suggestive use of

TRADITIONAL on the label of its feta cheese. Euphrates contends that it is entitled to use

TRADITIONAL as descriptive of its product. Gourmet Factory's motion for a preliminary

injunction is denied because TRADITIONAL is a descriptive, rather than a suggestive trademark.

**Background**

On January 5, 2005, Gourmet Factory, a distributor of feta, romano, and paremesan cheese,

sued Euphrates, a manufacturer of feta cheese, for trademark infringement and false designation of

origin and simultaneously moved for a preliminary injunction.

Gourmet Factory, formerly Aris Food Transit Inc. ("Aris"), had owned a registration on the

Principal Register of the United States Patent and Trademark Office ("U.S.P.T.O.") for the mark

TRADITIONAL for feta cheese (Reg. No. 1986974). However, in January, 2004, the mark was

cancelled because of Gourmet Factory's alleged failure to file an affidavit of continuing use as required by Lanham Act § 8, 15 U.S.C. § 1058.[1]  Gourmet Factory re-applied for registration of the TRADITIONAL mark on the Principal Register on March 23, 2004, and that application is presently pending before the U.S.P.T.O.  (Serial No. 78380017).[2]

### Findings of Fact

Pursuant to Fed. R. Civ. P. 65(a), the court held a hearing on the preliminary injunction.  At the hearing, Themis Kangadis ("Kangadis"), Vice President of Gourmet Factory Food, Inc., testified on behalf of plaintiff.  Hamdi Ulakaya ("Ulakaya"), President of Euphrates, Inc., and Steve Jenkins ("Jenkins"), a master cheese monger, testified on behalf of defendant.  With few exceptions, this court found all three witnesses credible.

The following facts were adduced at the hearing: Gourmet Factory has been in the business of importing and distributing cheese since 1986.  (Tr. at 4, 32.)  Its domestic feta cheese, distributed primarily in the New York-New England area under a label bearing the word TRADITIONAL, generates annual sales of four million dollars.  (*Id.* at 6, 8.)  Gourmet Factory does not manufacture its own cheese but, rather, buys cheese from various suppliers and sells it under its own TRADITIONAL label.  (*Id.* at 32.)  Gourmet Factory expends $200,000 annually on promotions for its TRADITIONAL line of feta cheese consisting of in-store advertisements and supermarket circulars, store and supermarket sampling booths, and participation in various trade shows.  (*Id.* at 7, 9, 37, 39, 61.)  The trade shows are held in convention centers in New York City, Chicago, and

---

[1] Gourmet Factory contests that its affidavit was untimely filed.  Docket Entry no. 23, Pl.'s Aff. Ex. 1, p. 7.

[2] On June 23, 2005, the U.S.P.T.O. completed a premiliary review and the "application [is to] be published for opposition." Docket Entry no. 23, Pl.'s Aff. Ex. 1, p. 1.

San Francisco and only trade members, not retail customers, are allowed. (*Id.* at 62.) Indeed, Gourmet Factory does not sell its TRADITIONAL feta cheese directly to retail customers but to food vendors who, in turn, supply restaurants and cruise ships. Various supermarkets and delicatessens also carry the Gourmet Factory TRADITIONAL line and sell it from the delicatessen case. (*Id.* at 64-66.) Gourmet Factory has attempted to protect its erstwhile registered trademark from dilution by securing a consent order from a federal court in a trademark infringement case prohibiting Fantis Foods, Inc. from using the word TRADITIONAL on feta cheese labels;[3] by contacting Nasonville Dairies and securing its agreement to cease using TRADITIONAL on its feta cheese packaging; and by filing the instant action. Gourmet Factory alleges that Euphrates began using TRADITIONAL to sell its feta cheese only after a meeting between the two companies.

Ulakaya, President of Euphrates, testified that he has worked in the cheese manufacturing industry for a total of approximately fifteen years producing, marketing, and selling feta cheese in Turkey for his family's cheese manufacturing company and later, in the United States, for Euphrates, also a family owned business. (*Id.* at 110.) When Ulakaya emigrated to the United States in 1994, he worked on a dairy farm to familiarize himself with the dairy industry in this country. In 2002, Ulakaya opened his own manufacturing plant in Johnstown, New York and began to manufacture and sell feta cheese that same year as Euphrates, Inc. Euphrates currently produces eight to ten million pounds of feta cheese annually and generates annual sales totaling over ten million dollars. (*Id.* at 107.) From 2002 until 2004, Euphrates sold its feta cheese without the word TRADITIONAL on the label. However, beginning in 2004, Euphrates changed its label by adding the words

---

[3] Consent Order entered on Jan. 22, 2003. *Aris Food Transit, Inc. v. Fantis Foods, Inc.*, No. 01-cv-6101 (D.N.J).

TRADITIONAL and MARMARIS.  (*Id.* at 120.)

As soon as it became aware of the alleged infringement in 2004, Gourmet Factory commenced the instant lawsuit and sought a preliminary injunction.  Euphrates contends that it is entitled to use TRADITIONAL as descriptive of its product.  Gourmet Factory insists that, when it comes to feta cheese production in the United States, there is nothing traditional either in its ingredients or in its method of production.  According to Gourmet Factory, TRADITIONAL does not describe the feta cheese; rather, it suggests or connotes traits that Gourmet Factory wants its consumers to attribute to TRADITIONAL feta and, therefore, is protectible under trademark law. This dispute, therefore, hinges on whether TRADITIONAL can be categorized as descriptive or suggestive.

## Discussion

### Preliminary Injunction Standard

To obtain a preliminary injunction, a party must demonstrate the probability of irreparable harm and either a likelihood of success on the merits or "a serious question going to the merits and a balance of hardships tipping decidedly in its favor." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  "In an action for trademark infringement, where a mark merits protection, a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). Thus, Gourmet Factory will be entitled to a preliminary injunction if it can show (1) that the TRADITIONAL mark merits protection and (2) that use of the mark by Euphrates will confuse

consumers as to the source of the feta cheese.

## Whether TRADITIONAL is a Legally Protectable Mark

At the time of the instant filing, the mark TRADITIONAL was unregistered and therefore not presumptively entitled to protection. *See* 15 U.S.C. § 1057(b); *see also Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). Whether TRADITIONAL is entitled to protection will therefore depend upon its classification into one of the categories set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976).

*Abercrombie & Fitch* set forth four different classes of trademark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. A generic mark, for example, "spoon" as it refers to a spoon, is not entitled to protection against infringement. At the other end of the spectrum, an arbitrary or fanciful mark, such as pegasus, the flying horse, as a symbol for the Mobil Oil Co., is entitled to the strongest protection available under trademark law. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987) (permanent injunction granted where Mobil Oil's flying horse mark was deemed to be an arbitrary mark infringed upon by Pegasus Petroleum Corp.'s use of the word "Pegasus" in the oil industry).

"A descriptive mark is one that forthwith conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *Bristol-Myers Squibbs*, 973 F.2d at 1040 (citing *Abercrombie & Fitch*, 537 F.2d at 11). A mark that is merely descriptive will not be entitled to protection against infringement unless it has acquired secondary meaning.[4] *Id.* For example, in the *Bristol-Myers* case, the Second Circuit held that, because PM as used in Tylenol PM denotes a nighttime product, it is a descriptive mark and consequently does not infringe on Bristol-Myers'

---

[4] *See infra* for discussion of secondary meaning.

Excedrin PM mark. Likewise, the Second Circuit held that "SPORTSCREME" as a name for a topical analgesic is descriptive because "[n]o exercise of the imagination is necessary for the public to understand that the product is a cream useful in connection with sports." *See Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985).

In contrast to a descriptive mark, a suggestive mark is entitled to some protection partly because it "requires imagination, thought, and perception to reach a conclusion as to the nature of [the] goods." *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988). This intentionally amorphous standard can only be understood by way of an example. The *Hasbro* case involved the alleged infringement of a 3 3/4-inch poseable marine action figure's code name, GUNG HO, conceived of by Hasbro. Concluding that GUNG HO was a suggestive term as applied to action figures, the court explained that the term described a "personality [trait] attributed to the toy … without describing the particular toy itself" and was therefore a mark eligible for protection against infringement *Id.* at 75.

In the present case, Gourmet Factory argues that the mark TRADITIONAL is entitled to trademark protection because the mark is used suggestively, meaning that the word is meant to evoke Old World qualities such as feta made by hand, aged in barrels, and with sheep's milk.[5] Therefore, Gourmet Factory argues, a finding that TRADITIONAL is a descriptive term is precluded by the fact that its feta cheese possesses none of these qualities. Ergo, the term must be suggestive. Taken to its logical conclusion, this argument would classify as suggestive all deceptively descriptive marks.

---

[5] In Greece, feta cheese is made with sheep's milk; but in the U.S., it is made with cow's milk. (Tr. at 74.)

Euphrates responds that the term TRADITIONAL serves to distinguish the kind of feta cheese sold under that label—made without removing the fat, without adding spices, and without ultrafiltration. (Tr. at 91, 154.) This statement finds support in an article entitled *Feta Jumps from Greek Salads to Supermarket Cheese Cases* by Amelia Buragas CHEESE MARKET NEWS, March 25, 2005, at 8, Def.'s Ex. I. The author writes, "One way producers enhance the market appeal of Feta is to add flavors. But not just traditional Greek herbs—IDM [Innovative Dairy Marketing], for example, has a jalapeno-flavored Feta that … goes great with nachos."

While it should not take an expert to understand what is meant by TRADITIONAL feta cheese, Euphrates' position that TRADITIONAL is a descriptive term was underscored by the testimony of Steve Jenkins, a master cheese monger belonging to the 700-year old Guilde du Saint Uguzon,[6] author of the James Beard Award-winning *Cheese Primer*, and professional cheese buyer for Fairway supermarkets. He testified that, by employing the term TRADITIONAL, manufacturers and distributors are simply trying to describe their fetas as "tast[ing] like feta that [comes] from Greece." (Tr. at 163.)

Based on the foregoing, the court finds that TRADITIONAL is a descriptive term. Therefore, the mark will be entitled to trademark protection only if it has acquired secondary meaning.

### Whether TRADITIONAL Has Acquired Secondary Meaning

"[T]he crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods." *Centaur Communications, Ltd. v. A/S/M Communications,*

---

[6] He is the first American inducted into France's ancient and elite Guilde du Maitre-Fromagers de St. Uguzon. (Tr. at 155.)

*Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) (citations omitted).  To determine whether a mark has acquired secondary meaning, courts in this circuit look to a variety of factors, including "advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use." *Bristol-Myers*, 973 F.2d at 1041.

**Advertising Expenses**

The Second Circuit, in *Centaur Communications*, found that the unregistered mark MARKETING WEEK was descriptive but subject to protection because it had acquired secondary meaning. *Centaur Communications,* 830 F.2d at 1222.  With respect to advertising expenditures, the court found that although its expenditures were relatively modest, $10,000 in direct mail solicitation, Centaur Communications invested efforts in publicizing its connection to the mark by sending brochures to the relevant consumer group (top American advertising agencies); by sending its senior director from Europe to the United States to meet with advertising agencies; and by sponsoring conferences featuring speakers from U.S. advertising agencies under the MARKETING WEEK banner.  These efforts together with the fact that Centaur Communications generated $250,000 in U.S. advertising revenue led the court to conclude that Centaur Communication successfully associated itself with the MARKETING WEEK trademark in the minds of the relevant consumer group.  *Id.*

Here, Gourmet factory incurred $200,000 in advertising expenses for in-store advertisements and supermarket circulars and store and supermarket sampling booths.  Gourmet Factory's four million dollars profit from its TRADITIONAL feta cheese is generated exclusively from its direct sales to food service distributors and professional cheese buyers.  Accordingly, they, and not retail customers, comprise the relevant consumer group.  Thus, its $200,000 advertising expenditures are

not an accurate reflection of the amount invested by Gourmet Factory on its efforts to associate itself with the TRADITIONAL feta cheese mark since its efforts are not directed at the relevant consumer group. Further reducing its alleged investment in its TRADITIONAL feta cheese line is the fact that Gourmet Factory exhibits all of its products, not just its TRADITIONAL feta cheese, at its booths at trade shows in which it has participated. While, the four million dollars in profits from its TRADITIONAL line of feta cheese is not insubstantial, Gourmet Factory failed to specify the size of its market share or the number of food service vendors it services. Particularly in light of Euphrates' ten million dollars profit, the evidence that Gourmet Factory's advertising efforts were effective in generating sales is inconclusive. *Centaur Communications*, 830 F.2d at 1222 (citing *First Brands Corp. v. Fred Meyer, Inc*., 809 F.2d 1378, 1383 (9th Cir. 1987) (test of secondary meaning is not the size of the expenditures used to create it but its effectiveness)).

**Consumer Studies/Surveys**

Neither party submitted any evidence of consumer surveys or studies linking the mark to the source. "[T]hough surveys have become the usual way of demonstrating secondary meaning, they are not the only way." *Centaur Communications*, 830 F.2d at 1223 (citation omitted). The court has considered the eleven affidavits submitted by Gourmet Factory as part of its application for a preliminary injunction. These affidavits are from the officers of various companies that do business with Gourmet Factory. Of these, only two are from professional buyers; the rest are from vice-presidents, controllers, or business owners. None of the affiants set forth the basis of their knowledge. We are left in the dark about whether their duties include buying cheese for their

respective companies and their expertise in that area.[7]  Jenkins, a professional cheese buyer for Fairway supermarkets, testified on behalf of Euphrates and unequivocally stated that he does not associate the TRADITIONAL mark with Gourmet Factory, or any other distributor or producer for that matter.  (Tr. at 161, 164.)  The court finds his testimony credible.

Thus, Gourmet Factory has not proven that the TRADITIONAL mark is linked to Gourmet Factory in the minds of the relevant consumer group.

**Sales Success**

As previously mentioned, Gourmet Factory generates four million dollars profit annually and distributes thousands of units[8] of its TRADITIONAL line of feta cheese.  These figures, coupled with Gourmet Factory's existence in one form or another since 1986 and Kangadis' testimony that its TRADITIONAL feta cheese was the leading brand in 2001 (Tr. at 20), leads this court to conclude that Gourmet Factory's TRADITIONAL feta cheese has had at least some sales success.

**Unsolicited Media Coverage**

This factor has no bearing on the present controversy since neither party submitted evidence with respect to media coverage.

**Attempts to Plagiarize**

As evidence of Euphrates' bad faith and its intent to plagiarize its mark, Gourmet Factory cites at least two meetings between the companies that occurred in late 2001 and early 2002. According to Kangadis, whose testimony the court credits in this regard, the first meeting was

---

[7] One of the relevant affiants, Franklin James, states that he is the national buyer for Restaurant Depot.  The other relevant affiant, Richard Kopniss, vaguely states that he is a buyer for his company.  (Reply Certification of Aris Kangadis dated March 14, 2005, Ex. B.)

[8] Kangadis defined "one to two units" as comprising "17 to 25 pounds of feta."  (Tr. at 18.)

initiated by Ulakaya, who sought to have Gourmet Factory, then Aris Food, Inc., import and distribute Ulakaya's Turkish feta cheese. (*Id.* at 18, 20.) Kangadis testified that Aris provided Ulakaya with Aris containers and TRADITIONAL labels for the cheese samples that Ulakaya was to provide. (*Id.* at 21.) Aris ultimately rejected Ulakaya's Turkish feta cheese and Ulakaya began manufacturing and distributing his own feta cheese that same year using a Euphrates, Inc. label. As already noted, two years later, Euphrates began using the word TRADITIONAL as well as the name MARMARIS on its label to sell feta cheese. When asked about the circumstances regarding the source of Ulakaya's referral to Gourmet Factory in 2001, Ulakaya responded that "[t]he industry is small." (*Id.* at 98.) Yet, he also stated that he did not become aware of Gourmet Factory's use of TRADITIONAL until served with the complaint in the instant action. (*Id.* at 100.) The court finds this testimony incredible. However, this finding does not necessarily lead to the conclusion that Euphrates plagiarized Gourmet Factory's mark.

In *Centaur Communications*, the court compared Centaur's MARKETING WEEK to A/S/M's mark and found striking similarities compelling the conclusion that the mark had been copied in an effort to take advantage of Centaur's consumer recognition and good will. 830 F.2d at 1224. Examination of each mark's trade dress in the instant case reveals considerable and significant differences. For example, Gourmet Factory's label consists of a white circle with a red border. In the center of the label, the red outline of the state of Wisconsin is depicted within which the word TRADITIONAL appears in a red font evocative of Greek letters. Underneath the word TRADITIONAL, in a smaller black font, is the word FETA. Gourmet Factory's company name and location is listed in even smaller black letters to the right of the Wisconsin outline. In contrast, Euphrates' label consists of a gold-bordered bright royal blue circle at the top of which an Ionic

column with the word MARMARIS going across is depicted.  This same word appears along the right and left edges of the glossy blue circle.  The middle of the circle is taken up by the word FETA that appears in a very large, Greek styled font.  Underneath the Ionic MARMARIS column but above the word FETA, in what appears to be a much smaller Times New Roman font, is the word TRADITIONAL.  These vastly different labels preclude an inference of plagiarism.

The court also finds that Ulakaya has proferred a credible explanation for his use of the TRADITIONAL mark.  He stated that it serves to distinguish his kind of feta cheese from the other available varieties including varieties he also expects to produce in the near future.  As previously noted, Euphrates' use of TRADITIONAL did not occur until 2004 even though the meetings between the two companies occurred at least two years before.  Instead, use of the mark TRADITIONAL did not occur until 2004, coinciding with the recent proliferation of varieties of feta as reported by the *Cheese Market News*.

The court concludes that Euphrates did not attempt to plagiarize Gourmet Factory's mark.

**Length and Exclusivity**

Gourmet Factory argues that its use of the TRADITIONAL mark has been long and exclusive.  It further argues that given its diligence in monitoring and protecting its interest in TRADITIONAL, the mark should be eligible for protection.

While Gourmet Factory did institute an action against Fantis Foods, Inc. and contacted Nasonville Dairy over the use of TRADITIONAL, the court finds that Gourmet Factory has failed to protect its mark assiduously enough.  Several companies have used TRADITIONAL on their feta cheese labels with impunity, including one of Gourmet Factory's own suppliers.  (Tr. at 45—54.) Indeed, Euphrates introduced into evidence no less than seven other labels bearing the mark

TRADITIONAL on feta cheese packaging.[9]  In light of the number of competitors using the word TRADITIONAL on their feta cheese packaging, Gourmet Factory's use of TRADITIONAL cannot be characterized as exclusive.

Given the expert testimony repudiating any connection in the minds of consumers between TRADITIONAL and Gourmet Factory, the marked differences in trade dress, and the non-exclusive nature of Gourmet Factory's use, this court determines that the TRADITIONAL mark has not acquired secondary meaning.  The mark is therefore descriptive only and ineligible for trademark protection.

## Conclusion

Because the use of the mark TRADITIONAL is ineligible for trademark protection, Gourmet Factory cannot demonstrate a likelihood of success on the merits.  Accordingly, Gourmet Factory's motion for a preliminary injunction is denied.

DATED:      Brooklyn, New York
              July 20, 2005

_____
DORA L. IRIZARRY
United States District Judge

---

[9] The following labels bearing the word TRADITIONAL were introduced: Odyssey, Def.'s Ex. B; Dimitri's and Athenos, Def.'s Ex. D; Greek Gods, Def.'s Ex. E; Argolis, Def.'s Ex. F; Saputo, Def.'s Ex. G; and Innovative Dairy Marketing, LLC., Def.'s Ex. I.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
KANGADIS, INC. d/b/a           :
GOURMET FACTORY,          :
                                   :
            Plaintiff,          :             **ORDER**
                                   :
        -against-            :        05-CV-111 (DLI)(RML)
                                   :
EUPHRATES, INC.,             :
                                   :
           Defendant.        :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

At issue in this application for a preliminary injunction is use of the word TRADITIONAL by Euphrates, Inc. ("Euphrates" or "defendant") on the label of its feta cheese. Kangadis, Inc. d/b/a Gourmet Factory ("Gourmet Factory" or "plaintiff") seeks to enjoin Euphrates from its use of this mark pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125 ("Lanham Act"). Gourmet Factory argues that trademark protection is warranted because of its first, exclusive, and suggestive use of TRADITIONAL on the label of its feta cheese. Euphrates contends that it is entitled to use TRADITIONAL as descriptive of its product. Gourmet Factory's motion for a preliminary injunction is denied because TRADITIONAL is a descriptive, rather than a suggestive trademark.

**Background**

On January 5, 2005, Gourmet Factory, a distributor of feta, romano, and paremesan cheese, sued Euphrates, a manufacturer of feta cheese, for trademark infringement and false designation of origin and simultaneously moved for a preliminary injunction.

Gourmet Factory, formerly Aris Food Transit Inc. ("Aris"), had owned a registration on the Principal Register of the United States Patent and Trademark Office ("U.S.P.T.O.") for the mark TRADITIONAL for feta cheese (Reg. No. 1986974). However, in January, 2004, the mark was

cancelled because of Gourmet Factory's alleged failure to file an affidavit of continuing use as required by Lanham Act § 8, 15 U.S.C. § 1058.[1] Gourmet Factory re-applied for registration of the TRADITIONAL mark on the Principal Register on March 23, 2004, and that application is presently pending before the U.S.P.T.O. (Serial No. 78380017).[2]

## Findings of Fact

Pursuant to Fed. R. Civ. P. 65(a), the court held a hearing on the preliminary injunction. At the hearing, Themis Kangadis ("Kangadis"), Vice President of Gourmet Factory Food, Inc., testified on behalf of plaintiff. Hamdi Ulakaya ("Ulakaya"), President of Euphrates, Inc., and Steve Jenkins ("Jenkins"), a master cheese monger, testified on behalf of defendant. With few exceptions, this court found all three witnesses credible.

The following facts were adduced at the hearing: Gourmet Factory has been in the business of importing and distributing cheese since 1986. (Tr. at 4, 32.) Its domestic feta cheese, distributed primarily in the New York-New England area under a label bearing the word TRADITIONAL, generates annual sales of four million dollars. (*Id.* at 6, 8.) Gourmet Factory does not manufacture its own cheese but, rather, buys cheese from various suppliers and sells it under its own TRADITIONAL label. (*Id.* at 32.) Gourmet Factory expends $200,000 annually on promotions for its TRADITIONAL line of feta cheese consisting of in-store advertisements and supermarket circulars, store and supermarket sampling booths, and participation in various trade shows. (*Id.* at 7, 9, 37, 39, 61.) The trade shows are held in convention centers in New York City, Chicago, and

---

[1] Gourmet Factory contests that its affidavit was untimely filed. Docket Entry no. 23, Pl.'s Aff. Ex. 1, p. 7.

[2] On June 23, 2005, the U.S.P.T.O. completed a premiliary review and the "application [is to] be published for opposition." Docket Entry no. 23, Pl.'s Aff. Ex. 1, p. 1.

San Francisco and only trade members, not retail customers, are allowed. (*Id.* at 62.) Indeed, Gourmet Factory does not sell its TRADITIONAL feta cheese directly to retail customers but to food vendors who, in turn, supply restaurants and cruise ships. Various supermarkets and delicatessens also carry the Gourmet Factory TRADITIONAL line and sell it from the delicatessen case. (*Id.* at 64-66.) Gourmet Factory has attempted to protect its erstwhile registered trademark from dilution by securing a consent order from a federal court in a trademark infringement case prohibiting Fantis Foods, Inc. from using the word TRADITIONAL on feta cheese labels;[3] by contacting Nasonville Dairies and securing its agreement to cease using TRADITIONAL on its feta cheese packaging; and by filing the instant action. Gourmet Factory alleges that Euphrates began using TRADITIONAL to sell its feta cheese only after a meeting between the two companies.

Ulakaya, President of Euphrates, testified that he has worked in the cheese manufacturing industry for a total of approximately fifteen years producing, marketing, and selling feta cheese in Turkey for his family's cheese manufacturing company and later, in the United States, for Euphrates, also a family owned business. (*Id.* at 110.) When Ulakaya emigrated to the United States in 1994, he worked on a dairy farm to familiarize himself with the dairy industry in this country. In 2002, Ulakaya opened his own manufacturing plant in Johnstown, New York and began to manufacture and sell feta cheese that same year as Euphrates, Inc. Euphrates currently produces eight to ten million pounds of feta cheese annually and generates annual sales totaling over ten million dollars. (*Id.* at 107.) From 2002 until 2004, Euphrates sold its feta cheese without the word TRADITIONAL on the label. However, beginning in 2004, Euphrates changed its label by adding the words

---

[3] Consent Order entered on Jan. 22, 2003. *Aris Food Transit, Inc. v. Fantis Foods, Inc.*, No. 01-cv-6101 (D.N.J.).

TRADITIONAL and MARMARIS.  (*Id.* at 120.)

As soon as it became aware of the alleged infringement in 2004, Gourmet Factory commenced the instant lawsuit and sought a preliminary injunction.  Euphrates contends that it is entitled to use TRADITIONAL as descriptive of its product.  Gourmet Factory insists that, when it comes to feta cheese production in the United States, there is nothing traditional either in its ingredients or in its method of production.  According to Gourmet Factory, TRADITIONAL does not describe the feta cheese; rather, it suggests or connotes traits that Gourmet Factory wants its consumers to attribute to TRADITIONAL feta and, therefore, is protectible under trademark law.  This dispute, therefore, hinges on whether TRADITIONAL can be categorized as descriptive or suggestive.

## Discussion

### Preliminary Injunction Standard

To obtain a preliminary injunction, a party must demonstrate the probability of irreparable harm and either a likelihood of success on the merits or "a serious question going to the merits and a balance of hardships tipping decidedly in its favor." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).  "In an action for trademark infringement, where a mark merits protection, a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).  Thus, Gourmet Factory will be entitled to a preliminary injunction if it can show (1) that the TRADITIONAL mark merits protection and (2) that use of the mark by Euphrates will confuse

consumers as to the source of the feta cheese.

## Whether TRADITIONAL is a Legally Protectable Mark

At the time of the instant filing, the mark TRADITIONAL was unregistered and therefore not presumptively entitled to protection. *See* 15 U.S.C. § 1057(b); *see also Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). Whether TRADITIONAL is entitled to protection will therefore depend upon its classification into one of the categories set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976).

*Abercrombie & Fitch* set forth four different classes of trademark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. A generic mark, for example, "spoon" as it refers to a spoon, is not entitled to protection against infringement. At the other end of the spectrum, an arbitrary or fanciful mark, such as pegasus, the flying horse, as a symbol for the Mobil Oil Co., is entitled to the strongest protection available under trademark law. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987) (permanent injunction granted where Mobil Oil's flying horse mark was deemed to be an arbitrary mark infringed upon by Pegasus Petroleum Corp.'s use of the word "Pegasus" in the oil industry).

"A descriptive mark is one that forthwith conveys an immediate idea of the ingredients, qualities, or characteristics of the goods." *Bristol-Myers Squibbs*, 973 F.2d at 1040 (citing *Abercrombie & Fitch*, 537 F.2d at 11). A mark that is merely descriptive will not be entitled to protection against infringement unless it has acquired secondary meaning.[4] *Id.* For example, in the *Bristol-Myers* case, the Second Circuit held that, because PM as used in Tylenol PM denotes a nighttime product, it is a descriptive mark and consequently does not infringe on Bristol-Myers'

---

[4] *See infra* for discussion of secondary meaning.

Excedrin PM mark. Likewise, the Second Circuit held that "SPORTSCREME" as a name for a topical analgesic is descriptive because "[n]o exercise of the imagination is necessary for the public to understand that the product is a cream useful in connection with sports." *See Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir. 1985).

In contrast to a descriptive mark, a suggestive mark is entitled to some protection partly because it "requires imagination, thought, and perception to reach a conclusion as to the nature of [the] goods." *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988). This intentionally amorphous standard can only be understood by way of an example. The *Hasbro* case involved the alleged infringement of a 3 3/4-inch poseable marine action figure's code name, GUNG HO, conceived of by Hasbro. Concluding that GUNG HO was a suggestive term as applied to action figures, the court explained that the term described a "personality [trait] attributed to the toy ... without describing the particular toy itself" and was therefore a mark eligible for protection against infringement *Id.* at 75.

In the present case, Gourmet Factory argues that the mark TRADITIONAL is entitled to trademark protection because the mark is used suggestively, meaning that the word is meant to evoke Old World qualities such as feta made by hand, aged in barrels, and with sheep's milk.[5] Therefore, Gourmet Factory argues, a finding that TRADITIONAL is a descriptive term is precluded by the fact that its feta cheese possesses none of these qualities. Ergo, the term must be suggestive. Taken to its logical conclusion, this argument would classify as suggestive all deceptively descriptive marks.

---

[5] In Greece, feta cheese is made with sheep's milk; but in the U.S., it is made with cow's milk. (Tr. at 74.)

Euphrates responds that the term TRADITIONAL serves to distinguish the kind of feta cheese sold under that label—made without removing the fat, without adding spices, and without ultrafiltration. (Tr. at 91, 154.) This statement finds support in an article entitled *Feta Jumps from Greek Salads to Supermarket Cheese Cases* by Amelia Buragas CHEESE MARKET NEWS, March 25, 2005, at 8, Def.'s Ex. I. The author writes, "One way producers enhance the market appeal of Feta is to add flavors. But not just traditional Greek herbs—IDM [Innovative Dairy Marketing], for example, has a jalapeno-flavored Feta that … goes great with nachos."

While it should not take an expert to understand what is meant by TRADITIONAL feta cheese, Euphrates' position that TRADITIONAL is a descriptive term was underscored by the testimony of Steve Jenkins, a master cheese monger belonging to the 700-year old Guilde du Saint Uguzon,[6] author of the James Beard Award-winning *Cheese Primer*, and professional cheese buyer for Fairway supermarkets. He testified that, by employing the term TRADITIONAL, manufacturers and distributors are simply trying to describe their fetas as "tast[ing] like feta that [comes] from Greece." (Tr. at 163.)

Based on the foregoing, the court finds that TRADITIONAL is a descriptive term. Therefore, the mark will be entitled to trademark protection only if it has acquired secondary meaning.

### Whether TRADITIONAL Has Acquired Secondary Meaning

"[T]he crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods." *Centaur Communications, Ltd. v. A/S/M Communications,*

---

[6] He is the first American inducted into France's ancient and elite Guilde du Maitre-Fromagers de St. Uguzon. (Tr. at 155.)

*Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) (citations omitted). To determine whether a mark has acquired secondary meaning, courts in this circuit look to a variety of factors, including "advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use." *Bristol-Myers*, 973 F.2d at 1041.

**Advertising Expenses**

The Second Circuit, in *Centaur Communications*, found that the unregistered mark MARKETING WEEK was descriptive but subject to protection because it had acquired secondary meaning. *Centaur Communications,* 830 F.2d at 1222. With respect to advertising expenditures, the court found that although its expenditures were relatively modest, $10,000 in direct mail solicitation, Centaur Communications invested efforts in publicizing its connection to the mark by sending brochures to the relevant consumer group (top American advertising agencies); by sending its senior director from Europe to the United States to meet with advertising agencies; and by sponsoring conferences featuring speakers from U.S. advertising agencies under the MARKETING WEEK banner. These efforts together with the fact that Centaur Communications generated $250,000 in U.S. advertising revenue led the court to conclude that Centaur Communication successfully associated itself with the MARKETING WEEK trademark in the minds of the relevant consumer group. *Id.*

Here, Gourmet factory incurred $200,000 in advertising expenses for in-store advertisements and supermarket circulars and store and supermarket sampling booths. Gourmet Factory's four million dollars profit from its TRADITIONAL feta cheese is generated exclusively from its direct sales to food service distributors and professional cheese buyers. Accordingly, they, and not retail customers, comprise the relevant consumer group. Thus, its $200,000 advertising expenditures are

not an accurate reflection of the amount invested by Gourmet Factory on its efforts to associate itself with the TRADITIONAL feta cheese mark since its efforts are not directed at the relevant consumer group. Further reducing its alleged investment in its TRADITIONAL feta cheese line is the fact that Gourmet Factory exhibits all of its products, not just its TRADITIONAL feta cheese, at its booths at trade shows in which it has participated. While, the four million dollars in profits from its TRADITIONAL line of feta cheese is not insubstantial, Gourmet Factory failed to specify the size of its market share or the number of food service vendors it services. Particularly in light of Euphrates' ten million dollars profit, the evidence that Gourmet Factory's advertising efforts were effective in generating sales is inconclusive. *Centaur Communications*, 830 F.2d at 1222 (citing *First Brands Corp. v. Fred Meyer, Inc*., 809 F.2d 1378, 1383 (9th Cir. 1987) (test of secondary meaning is not the size of the expenditures used to create it but its effectiveness)).

**Consumer Studies/Surveys**

Neither party submitted any evidence of consumer surveys or studies linking the mark to the source. "[T]hough surveys have become the usual way of demonstrating secondary meaning, they are not the only way." *Centaur Communications*, 830 F.2d at 1223 (citation omitted). The court has considered the eleven affidavits submitted by Gourmet Factory as part of its application for a preliminary injunction. These affidavits are from the officers of various companies that do business with Gourmet Factory. Of these, only two are from professional buyers; the rest are from vice-presidents, controllers, or business owners. None of the affiants set forth the basis of their knowledge. We are left in the dark about whether their duties include buying cheese for their

respective companies and their expertise in that area.[7]  Jenkins, a professional cheese buyer for Fairway supermarkets, testified on behalf of Euphrates and unequivocally stated that he does not associate the TRADITIONAL mark with Gourmet Factory, or any other distributor or producer for that matter.  (Tr. at 161, 164.)  The court finds his testimony credible.

Thus, Gourmet Factory has not proven that the TRADITIONAL mark is linked to Gourmet Factory in the minds of the relevant consumer group.

**Sales Success**

As previously mentioned, Gourmet Factory generates four million dollars profit annually and distributes thousands of units[8] of its TRADITIONAL line of feta cheese.  These figures, coupled with Gourmet Factory's existence in one form or another since 1986 and Kangadis' testimony that its TRADITIONAL feta cheese was the leading brand in 2001 (Tr. at 20), leads this court to conclude that Gourmet Factory's TRADITIONAL feta cheese has had at least some sales success.

**Unsolicited Media Coverage**

This factor has no bearing on the present controversy since neither party submitted evidence with respect to media coverage.

**Attempts to Plagiarize**

As evidence of Euphrates' bad faith and its intent to plagiarize its mark, Gourmet Factory cites at least two meetings between the companies that occurred in late 2001 and early 2002. According to Kangadis, whose testimony the court credits in this regard, the first meeting was

---

[7] One of the relevant affiants, Franklin James, states that he is the national buyer for Restaurant Depot. The other relevant affiant, Richard Kopniss, vaguely states that he is a buyer for his company. (Reply Certification of Aris Kangadis dated March 14, 2005, Ex. B.)

[8] Kangadis defined "one to two units" as comprising "17 to 25 pounds of feta."  (Tr. at 18.)

initiated by Ulakaya, who sought to have Gourmet Factory, then Aris Food, Inc., import and distribute Ulakaya's Turkish feta cheese. (*Id.* at 18, 20.) Kangadis testified that Aris provided Ulakaya with Aris containers and TRADITIONAL labels for the cheese samples that Ulakaya was to provide. (*Id.* at 21.) Aris ultimately rejected Ulakaya's Turkish feta cheese and Ulakaya began manufacturing and distributing his own feta cheese that same year using a Euphrates, Inc. label. As already noted, two years later, Euphrates began using the word TRADITIONAL as well as the name MARMARIS on its label to sell feta cheese. When asked about the circumstances regarding the source of Ulakaya's referral to Gourmet Factory in 2001, Ulakaya responded that "[t]he industry is small." (*Id.* at 98.) Yet, he also stated that he did not become aware of Gourmet Factory's use of TRADITIONAL until served with the complaint in the instant action. (*Id.* at 100.) The court finds this testimony incredible. However, this finding does not necessarily lead to the conclusion that Euphrates plagiarized Gourmet Factory's mark.

In *Centaur Communications*, the court compared Centaur's MARKETING WEEK to A/S/M's mark and found striking similarities compelling the conclusion that the mark had been copied in an effort to take advantage of Centaur's consumer recognition and good will. 830 F.2d at 1224. Examination of each mark's trade dress in the instant case reveals considerable and significant differences. For example, Gourmet Factory's label consists of a white circle with a red border. In the center of the label, the red outline of the state of Wisconsin is depicted within which the word TRADITIONAL appears in a red font evocative of Greek letters. Underneath the word TRADITIONAL, in a smaller black font, is the word FETA. Gourmet Factory's company name and location is listed in even smaller black letters to the right of the Wisconsin outline. In contrast, Euphrates' label consists of a gold-bordered bright royal blue circle at the top of which an Ionic

column with the word MARMARIS going across is depicted. This same word appears along the right and left edges of the glossy blue circle. The middle of the circle is taken up by the word FETA that appears in a very large, Greek styled font. Underneath the Ionic MARMARIS column but above the word FETA, in what appears to be a much smaller Times New Roman font, is the word TRADITIONAL. These vastly different labels preclude an inference of plagiarism.

The court also finds that Ulakaya has proferred a credible explanation for his use of the TRADITIONAL mark. He stated that it serves to distinguish his kind of feta cheese from the other available varieties including varieties he also expects to produce in the near future. As previously noted, Euphrates' use of TRADITIONAL did not occur until 2004 even though the meetings between the two companies occurred at least two years before. Instead, use of the mark TRADITIONAL did not occur until 2004, coinciding with the recent proliferation of varieties of feta as reported by the *Cheese Market News*.

The court concludes that Euphrates did not attempt to plagiarize Gourmet Factory's mark.

**Length and Exclusivity**

Gourmet Factory argues that its use of the TRADITIONAL mark has been long and exclusive. It further argues that given its diligence in monitoring and protecting its interest in TRADITIONAL, the mark should be eligible for protection.

While Gourmet Factory did institute an action against Fantis Foods, Inc. and contacted Nasonville Dairy over the use of TRADITIONAL, the court finds that Gourmet Factory has failed to protect its mark assiduously enough. Several companies have used TRADITIONAL on their feta cheese labels with impunity, including one of Gourmet Factory's own suppliers. (Tr. at 45—54.) Indeed, Euphrates introduced into evidence no less than seven other labels bearing the mark

TRADITIONAL on feta cheese packaging.[9]  In light of the number of competitors using the word TRADITIONAL on their feta cheese packaging, Gourmet Factory's use of TRADITIONAL cannot be characterized as exclusive.

Given the expert testimony repudiating any connection in the minds of consumers between TRADITIONAL and Gourmet Factory, the marked differences in trade dress, and the non-exclusive nature of Gourmet Factory's use, this court determines that the TRADITIONAL mark has not acquired secondary meaning.  The mark is therefore descriptive only and ineligible for trademark protection.

## Conclusion

Because the use of the mark TRADITIONAL is ineligible for trademark protection, Gourmet Factory cannot demonstrate a likelihood of success on the merits.  Accordingly, Gourmet Factory's motion for a preliminary injunction is denied.


DATED:          Brooklyn, New York
                July 20, 2005



                                        _____
                                        DORA L. IRIZARRY
                                        United States District Judge



---

[9] The following labels bearing the word TRADITIONAL were introduced: Odyssey, Def.'s Ex. B; Dimitri's and Athenos, Def.'s Ex. D; Greek Gods, Def.'s Ex. E; Argolis, Def.'s Ex. F; Saputo, Def.'s Ex. G; and Innovative Dairy Marketing, LLC., Def.'s Ex. I.